UNCLASSIFIED//FOR PUBLIC RELEASE

FILED WITH THE
COURT SECURITY OFFICER
CSO: M Peleos
DATE: 3 / 24 / 10

~~SECRET//NOFORN~~

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MUKHTAR YAHIA NAJI AL WARAFI (ISN 117), | ) ) ) |
| Petitioner, | ) ) |
| v. | ) ) Civil No. 09-2368 (RCL) |
| BARACK OBAMA, *et al.*, | ) ) |
| Respondents. | ) ) |

## MEMORANDUM OPINION

Petitioner Mukhtar Yahia Naji al Warafi ("petitioner") is challenging the legality of his detention at the United States Naval Base in Guantanamo, Cuba ("Guantanamo"), where respondents have detained him since 2002. Respondents contend that petitioner's detention is lawful under the Authorization for the Use of Military Force ("AUMF"), Pub. L. No. 107-40 § 2(a), 115 Stat. 224 (2002). The AUMF authorizes the President to detain individuals who were part of, or substantially supported, the Taliban, Al Qaeda, or associated forces that are engaged in hostilities against the United States or its coalition partners. Specifically, respondents argue that petitioner joined the Taliban in Afghanistan and fought against the Northern Alliance.

Petitioner argues that his detention is not lawful under the AUMF because he never joined the Taliban. Rather, he claims that he went to Afghanistan for the sole purpose of working as an assistant at a medical clinic. In the alternative, petitioner asserts as an affirmative defense that, even if he were a part of the Taliban, his detention is not lawful because he was

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

exclusively engaged in providing medical services to the Taliban, and thus qualifies as non-detainable medical personnel under Article 24 of the First Geneva Convention.

On January 12, 2010, the Court conducted a merits hearing on this matter to determine the legality of petitioner's detention. At the conclusion of the merits hearing, the Court granted the parties' request to provide supplemental briefing to address the effect, if any, of the Court of Appeals' recent decision in *Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010), on this matter.

Based upon the arguments of counsel, the exhibits, and the supplemental briefings, the Court concludes that respondents may lawfully detain petitioner under the AUMF because the evidence demonstrates that petitioner more likely than not was part of Taliban forces. In addition, petitioner's alternative argument fails because petitioner may not invoke the Geneva Conventions in his habeas proceeding as a source of rights. Accordingly, for the reasons set forth below, the Court will DENY petitioner's petition for a writ of habeas corpus.

## I.    BACKGROUND

Petitioner is a Yemeni citizen who was born in Taiz, Yemen. (J. Ex. 1 ¶ 1; J. Ex. 40 ¶ 1.) He has only a few years of formal education and has worked since a young age. (J. Ex. 1 ¶ 3; J. Ex. 40 ¶¶ 2-3.) Petitioner's employment history consists of a variety of odd jobs, including stints as a waiter, a dishwasher, a custodian, and, for a short while, a lab assistant at his brother's medical clinic in Taiz. (J. Ex. 1 ¶ 5; J. Ex. 8 ¶ 1; J. Ex. 40 ¶ 4.) At his brother's clinic, he learned several basic medical skills, including how to administer IVs and take blood samples. (J. Ex. 40 ¶ 4.)

Petitioner did not serve in the military or receive formal military training in Yemen. (J.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Ex. 1 ¶ 4.) Like many Yemeni, however, he learned how to use firearms and often hunted wild game with a rifle. (*Id.*; J. Ex. 40 ¶ 5.)

In the spring of 2001, petitioner read two fatwas at the Jamal Al Din Mosque in Taiz. (J. Ex. 1 ¶ 7; J. Ex. 40 ¶ 6.) The fatwas discussed the Taliban and its victories in Afghanistan and encouraged individuals to assist the Taliban. (*Id.*) One of the fatwas described the travel route individuals should take if they wish to go to Afghanistan to assist the Taliban. (J. Ex. 1 ¶ 7.) The fatwa instructed individuals to travel to the Taliban Center in Quetta, Pakistan. Once there, members of the Taliban would assist individuals in crossing the border into Afghanistan. (*Id.*)

In August 2001, petitioner decided that he would heed the fatwas and travel to Afghanistan to assist the Taliban. (*Id.*; J. Ex. 18 ¶ 7; J. Ex. 40 ¶ 7.) To fund his trip, petitioner borrowed $400 from his father. (J. Ex. 1 ¶ 8; J. Ex. 18 ¶ 7; J. Ex. 40 ¶ 8.) Petitioner did not tell his father that the money was to travel to Afghanistan. (*Id.*) Instead, he told his father that he needed the money to take a pilgrimage to Mecca, Saudi Arabia. (J. Ex. 1 ¶ 8; J. Ex. 18 ¶ 7.) Similarly, petitioner concealed the purpose of his trip when he went to the Pakistani embassy to obtain a visa. (J. Ex. 1 ¶ 8.) He told the Pakistani officials that he was traveling to Pakistan to seek medical treatment, even though his true purpose was to travel to Pakistan to gain entry into Afghanistan. (*Id.*) The only persons with whom petitioner discussed the true purpose of his trip were his mother and older brother. (J. Ex. 40 ¶ 8.)

Having used a portion of his father's loan to purchase an airline ticket, petitioner traveled to Karachi, Pakistan. (J. Ex. 1 ¶¶ 8-9.) As the fatwa instructed, petitioner then traveled by taxi and bus to Quetta, Pakistan, where he went to the Taliban Center. (*Id.* ¶ 9.) He told the officials

3

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

there that he would like to fight the Northern Alliance in Afghanistan. (*Id.*) The officials

accepted his offer to assist the Taliban in its fight against the Northern Alliance and arranged for

his travel into Afghanistan. (*Id.*)

Petitioner entered Afghanistan at Spin Balduk. (*Id.*) He then traveled to Kabul, where he

stayed for several days before continuing on to Konduz. (*Id.* ¶¶ 9-10.) From Konduz, petitioner

traveled to the Khoja Khar line, which was where the Taliban were fighting the Northern

Alliance. (*Id.*)

Petitioner spent approximately one to two weeks at the Khoja Khar line. (*Id.* ¶ 10; J. Ex.

18 ¶¶ 10-11; Gov't Ex. 1.) While there, he received training on an AK-47, but did not engage in

any active combat. (*Id.*) A superior then sought volunteers to serve as medics at a nearby clinic.

(Gov't Ex. 1.) Petitioner volunteered and was transferred to a clinic run by a Saudi doctor, Dr.

Abdullah Aziz, for first aid training. (J. Ex. 1 ¶ 11; Gov't Ex. 1.)

The clinic was located approximately twenty kilometers from the Khoja Khar line in

Dastareshi. (J. Ex. 40 ¶ 16.) At the clinic, Dr. Aziz taught petitioner how to clean wounds, draw

blood, and recognize the symptoms of malaria. (Gov't Ex. 1.) Petitioner remained at the clinic

for approximately twenty-five days and treated approximately six to seven sick and wounded

Taliban fighters per day. (*Id.*)

Petitioner was then transferred from the Dastareshi clinic to a clinic in Konduz, which

was also run by Dr. Aziz and was known as the Al Ansar Clinic. (*Id.*; J. Ex. 7 ¶ 1.) Petitioner

treated wounded and sick Taliban fighters at the Al Ansar Clinic. (Gov't Ex. 1; J. Ex. 7 ¶ 4.)

After one month, petitioner left the Al Ansar Clinic and went to work at a hospital because the

**4**

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

area in which the Al Ansar Clinic was located had become too dangerous as the Northern

Alliance advanced toward Konduz. (Gov't Ex. 1.)

On November 23, 2001, after experiencing several days of air strikes in Konduz, the

Taliban agreed to surrender to Coalition forces. (J. Ex. 1 ¶ 11; J. Ex. 5; J. Ex. 18 ¶ 12.) As part

of this surrender, Thakker, petitioner's Taliban commander, negotiated a safe passage from

Konduz to Kandahar via Mazar-e-Sharif for petitioner and the others under Thakker's command.

(J. Ex. 18 ¶ 12.) Petitioner believed that when he and the others reached Kandahar, they would

be returned to their home countries. (J. Ex. 5.) As a result, petitioner, along with Dr. Aziz and

others, left Konduz for Kandahar via Mazar-e-Sharif pursuant to the safe passage negotiated by

Thakker. (J. Ex. ¶ 1 12.)

Petitioner, however, never arrived at Kandahar. On November 24, 2001, Dostum, the

commander of the Northern Alliance, detained Thakker's men, including petitioner and Dr. Aziz.

(*Id.*; J. Ex. 40 ¶ 20.) Dostum's troops ordered petitioner and the others to surrender their

weapons and then transported them to the Qala-i-Jangi prison. (J. Ex. 1 ¶ 12; J. Ex. 18 ¶ 12.)

On November 25, 2001, an uprising occurred at the prison. (J. Ex. 1 ¶ 12.) The Northern

Alliance soldiers repelled the uprising by firing at the prisoners. (*Id.*) Many prisoners were

killed, including Dr. Aziz. (J. Ex. 40 ¶ 21.) Petitioner was shot in the arm and then sought

refuge in the basement. (*Id.* ¶¶ 21-22.) About one hundred other prisoners were also hiding in

the basement. (*Id.* ¶ 22.) After eight days, the International Red Cross intervened, and petitioner

and the others surrendered to the Northern Alliance. (*Id.* ¶ 23.) Petitioner was then transferred to

the Shebrigan prison. (*Id.*)

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

After several weeks at Shebrigan, petitioner was transferred to the custody of the United States in Kandahar. (*Id.* ¶ 24.) The United States held petitioner at a prison in Kandahar for approximately three months. (*Id.*) Then, the United States transferred petitioner to Guantanamo Bay, where he has remained since 2002. (*Id.*)

## II.   LEGAL STANDARDS

### A.   *Detention Standard*

This Court has previously held that the AUMF authorizes respondents to lawfully detain individuals who were part of the Taliban, Al Qaeda, or associated enemy forces. *See Mattan v. Obama*, 618 F. Supp. 2d 24, 26 (D.D.C. 2009) (adopting the detention standard set forth by Judge Bates in *Hamlily v. Obama*, 616 F. Supp. 2d 63, 77-78 (D.D.C. 2009)). Recently, however, the Court of Appeals approved a more expansive detention standard. *Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010). Specifically, the court recognized that respondents could lawfully detain not only individuals who were part of the Taliban, Al Qaeda, or associated enemy forces, but also individuals who substantially supported the Taliban, Al Qaeda, or associated enemy forces. *Id.* Accordingly, respondents' detention authority has two independently sufficient prongs: (1) whether an individual is part of the Taliban, Al Qaeda, or associated enemy forces; and (2) whether an individual substantially supported the Taliban, Al Qaeda, or associated enemy forces. *Id.*

This matter concerns only the first prong of the detention standard—*i.e.*, whether

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

petitioner was part of the Taliban.[1] There are no established criteria for the Court to apply to

answer this question. *Hamlily*, 616, F. Supp. 2d at 75. As a result, the Court employs a

functional, rather than formal, approach. *Id.* The "key inquiry" of this approach is whether

petitioner functioned or participated within or under the command structure of the Taliban—*i.e,*

whether he received and executed orders or directions. *Id.* This inquiry, however, "does not

encompass those individuals who unwittingly become part of the [Taliban] apparatus—some

level of knowledge or intent is required." *Id.*

Although the Court may consider any number of factors to determine whether petitioner

was part of the Taliban, one factor the Court will not consider is whether petitioner presently

poses a threat to the national security of the United States. *See Anam v. Obama*, Civ. No. 04-

1194, 2010 WL 58965 at *2, – F. Supp. 2d –, – (D.D.C. Jan. 6, 2010) (Hogan, J.) (rejecting the

proposition that the United States may only detain individuals who are likely to rejoin the

battlefield adopted by Judge Huvelle in *Basardah v. Obama*, 612 F. Sup. 2d 30, 34 (D.D.C.

2009)). The AUMF is clear that respondents may detain individuals "for the duration of the

relevant conflict . . . based on longstanding law-of-war principles." *Id.* (quoting *Hamdi v.

Rumsfeld*, 542 U.S. 507, 521 (2004)). Thus, as long as the conflict continues, respondents may

lawfully detain an individual who was part of the Taliban, "even if that individual does not

---

[1] As Judge Hogan noted in *Anam v. Obama*, this Court need not address whether petitioner "substantially supported" the Taliban because the Court holds that petitioner was "part of" the Taliban. Civ. No. 04-1194, 2010 WL 58965 at n.1, (D.D.C. Jan. 6 2010). Moreover, the parties had stipulated prior to the Merits Hearing that the sole issue was whether the evidence shows that petitioner was more likely than not part of the Taliban.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

presently pose a threat to the national security of the United States." *Id.* (citing *Al-Bihani*, 590

F.3d at 874).

**B.     Burden of Proof**

This Court follows the procedures set forth in the Case Management Order ("CMO")

issued by Judge Hogan in the consolidated habeas cases on November 6, 2008, as amended

December 16, 2008. Pursuant to the Amended CMO, respondents "bear the burden of proving

by a preponderance of the evidence that the petitioner's detention is lawful." *In re Guantanamo*

*Bay Litig.*, 08-442, CMO § II.A. (Nov. 6, 2008); *see also Al-Bihani*, 590 F.3d at 878. Thus,

respondents may lawfully detain petitioner if they demonstrate that petitioner more likely than

not was part of the Taliban.

**C.     Evidentiary Standard**

In Guantanamo habeas proceedings, the Court must assess the "accuracy, reliability, and

credibility" of each piece of evidence presented by the parties "in the context of the evidence as a

whole." *Abdah v. Obama*, Civ. No. 04-1254, Order [606] (D.D.C. Aug. 26, 2009) (Kennedy,

J.).[2] The burden is on the party submitting the evidence to establish its accuracy, reliability, and

credibility. *Id.* When a party submits hearsay evidence, "the question a habeas court must ask . .

. is not whether it is admissible—it is always admissible—but what probative weight to ascribe to

whatever indicia of reliability it exhibits." *Al-Bihani*, 590 F.3d at 879. Thus, the Court will

---

[2] This matter was transferred to the undersigned from Judge Kennedy on December 14,
2009. *Abdah v. Obama*, Civ. No 04-1254, Order [721] (D.D.C. Dec. 14, 2009). As a result, any
orders issued by Judge Kennedy before December 14, 2009 in *Abdah* are binding on petitioner's
case.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

assess the accuracy, reliability, and credibility of all evidence, including hearsay, that is necessary

to answer "a simple, binary question: is detention lawful?" *Id.* at 880.

## III.   ANALYSIS

Before the Court can determine the legality of petitioner's detention, it must first assess

the accuracy, reliability, and credibility of the evidence presented by the parties.  The Court will

then address whether the evidence shows that petitioner more likely than not was part of the

Taliban.  Last, the Court will address petitioner's alternative argument that his detention is not

lawful under Article 24 of the First Geneva Convention.

### A.     *Assessment of the Evidence*

The parties submitted a total of 112 exhibits for the Court to review.  After reviewing the

exhibits and hearing the parties' arguments at the Merits Hearing, the Court has identified which

exhibits are material to petitioner's petition for a writ of habeas corpus.  The Court will now

address the accuracy, reliability, and credibility of those exhibits.

#### 1.     *Interrogation Reports and Summaries*

Respondents primarily rely on the statements of petitioner that are contained in eight

classified interrogation reports or summaries.  (*See* J. Exs. 1, 2, 5, 7, 8, 17, and 18; Gov't Ex. 1.)

These interrogation reports and summaries are hearsay evidence.  *See Al-Bihani*, 590 F.3d at 879

(noting that interrogation reports and summaries have a level of hearsay).  That the summaries

and reports are hearsay, however, does not render the statements contained therein inadmissible.

*Id.*  To the contrary, in Guantanamo habeas proceedings, hearsay evidence is always admissible,

and the Court is charged with assessing its reliability.  *Id.* at 879-80.  As the party relying on

9

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

these statements, respondents have the burden of establishing that the interrogation reports and summaries, and thus the statements within the reports and summaries, are accurate, reliable, and credible.

Respondents have met their burden. Respondents demonstrated the accuracy of the interrogation summaries and reports by including the original notes of the interrogators. Similarly, they established that the interrogation summaries and reports on which they rely are reliable and credible. First, petitioner does not allege that the statements contained in the summaries and reports were coerced, and there is nothing in the record to indicate that the statements were coerced. As a result, petitioner's statements do not suffer from the taint of unreliability inherent in coerced statements. Second, that the statements were translated does not render them unreliable or incredible. Petitioner's reservations about the accuracy of the translations of the statements goes to the weight of the Court should afford the statements, not their reliability. Last, the summaries and reports are largely consistent with the evidence as a whole, including petitioner's declaration and his statements before the Administrative Review Board ("ARB"). Accordingly, the interrogation reports and summaries upon which respondents rely are accurate, reliable, and credible.

2. *Petitioner's Statement to the Administrative Review Board and Declaration in Support of his Habeas Petition*

Petitioner relies on two documents in which he denies being a part of the Taliban: the summary of his statement before the ARB and the declaration he submitted in support of his habeas petition in lieu of testifying during the Merits Hearing. (J. Ex. 38; J. Ex. 40.) There is no

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

dispute that these documents are accurate. Furthermore, these documents are reliable in part, specifically the portions of the documents that are corroborated by respondents' evidence and other reliable evidence in the record. Moreover, neither statement was coerced.

Nevertheless, the Court cannot accept the entire documents as reliable. First, petitioner's statements in the ARB proceeding and his declaration are inconsistent. For example, he denied treating wounded soldiers at the ARB proceeding, but admitted to treating soldiers in his declaration. (J. Ex. 38 ¶ 18; J. Ex. 40 ¶ 18.) He also provided conflicting accounts of his use of an AK-47 while in Afghanistan. (J. Ex. 38 ¶ 18; J. Ex. 40 ¶ 15.) Second, petitioner's declaration is a self-serving document that was submitted in lieu of live testimony. As a result, respondents could not cross-examine petitioner on the contents of the declaration. Thus, the Court cannot adequately assess the reliability of petitioner's explanations for taking certain actions or the statements for which he failed to provide an explanation. For example, the Court cannot assess petitioner's explanation for why he went to the front line or learn why petitioner went to Mazar-e-Sharif. (J. Ex. 40 ¶¶ 14, 19.)

Accordingly, petitioner's declaration and the summary of petitioner's ARB proceeding are reliable in part and unreliable in part. To the extent that the documents are inconsistent with each other and the other reliable evidence on the record, the Court finds that the documents are not credible and will defer to the other reliable evidence on the record. The Court will also defer to the other reliable evidence where petitioner's declaration fails to explain why he took certain actions or where petitioner's declaration offers an explanation that is unsupported in the record.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

### 3.     *Third-Party Statements*

In addition to the interrogation summaries and reports above, respondents rely on a handful of third-party statements, which were made by other detainees, to corroborate and supplement petitioner's admissions. (*See* J. Exs. 3, 4, 16, 19, 20, 21, 26.) In these statements, the witnesses identify petitioner as an individual associated with the Taliban and place petitioner at certain locations, including the Khoja Khar line, Konduz, and Shebrigan prison.

Respondents have not provided any evidence demonstrating that these statements are accurate, reliable, and credible. In particular, respondents have not assured the Court that these statements were not coerced. In addition, respondents have determined that at least one of the detainees on whose statements they rely is unreliable. Accordingly, the Court will not rely on these statements to answer the question of whether petitioner's detention is lawful.

Therefore, the accurate, reliable, and credible evidence in the record consists of the summaries and reports of petitioner's interrogations, the summary of petitioner's statements before the ARB in part, and petitioner's declaration in part. From this evidence, the Court will answer the question:  was petitioner more likely than not a part of the Taliban?

**B.     The Reliable Evidence Shows That Petitioner More Likely Than Not Was "Part of" the Taliban**

Respondents contend that petitioner was more likely than not part of the Taliban because: (1) petitioner traveled to Afghanistan to fight with the Taliban against the Northern Alliance after reading two fatwas in support of the Taliban; (2) petitioner was stationed on the Khoja Khar front line and received weapons training there; (3) petitioner volunteered to serve as a medical

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

assistant on an as needed basis and provided medical treatment to wounded Taliban fighters; and

(4) petitioner traveled to Mazar-e-Sharif on his commander's orders to surrender to the Northern

Alliance. Based on the reliable evidence in the record, the Court agrees with respondents and

finds that petitioner more likely than not was part of the Taliban.

### 1.    *Petitioner Traveled to Afghanistan to Fight with the Taliban*

Respondents rely on several interrogation reports and summaries in which petitioner

stated that he went to Afghanistan to fight against the Northern Alliance after reading two fatwas

in Yemen. (*See* J. Exs. 1, 5, 8, 18; Gov't Ex. 1.) Petitioner admits that he was inspired by the

fatwas to travel to Afghanistan to help the Afghan people. (J. Ex. 40 ¶¶ 6-7.) He also admits

that he followed the travel route explained in one of the fatwas. (J. Ex. 1 ¶ 7.) Petitioner,

however, denies that he traveled to fight with the Taliban. (J. Ex. 38 ¶¶ 16, 18; J. Ex. 40 ¶ 11.)

He argues that he traveled to Afghanistan to provide medical assistance. (*Id.*)

Petitioner's argument is directly contrary to his original, reliable statements. His only

explanation for his inconsistent statements is that he did not make the statements that are

attributed to him during his interrogations. Petitioner argues that he only told interrogators that

he went to Afghanistan to "assist the Taliban" by providing medical services  (J. Ex. 1 ¶ 7; J. Ex.

40 ¶ 11.) The Court is not convinced by petitioner's explanation.

First, the interrogation summary in which he states that he went to Afghanistan to assist

the Taliban states in other paragraphs that he went to Afghanistan to fight against the Northern

Alliance. Specifically, the interrogation summary states that he told the officials at the Taliban

center that he wanted "to fight the Northern Alliance" and that he wanted to go to northern

13
SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Afghanistan because that was where the fighting was. (J. Ex. 1 ¶¶ 9-10.) Second, the notes underlying the interrogation summary state that petitioner went to Afghanistan after reading two fatwas that encouraged Muslims to help the Taliban fight the Northern Alliance. (J. Ex. 41.) Third, the interrogation reports relied upon by respondents consistently state that petitioner admitted that he went to Afghanistan to fight the Northern Alliance. (*See, e.g.*, J. Exs. 1, 8, 18.) Petitioner's recent denials of his statements in the interrogation reports do not outweigh his previous consistent admissions.

Accordingly, after weighing the reliable evidence, Court finds that respondents have shown by a preponderance of the evidence that petitioner traveled to Afghanistan to fight with the Taliban. Moreover, even if the evidence failed to demonstrate that petitioner more likely than not traveled to Afghanistan to fight with the Taliban, the Court would not be precluded from finding that petitioner was part of the Taliban. An individual is part of the Taliban if he operates within its command structure. If petitioner provided medical service within the Taliban's command structure—*i.e.*, provided service where the Taliban ordered him to—he would be part of the Taliban, and therefore detainable.

### 2. *Petitioner Received Weapons Training at the Khoja Khar Line*

Petitioner concedes that after he arrived in Afghanistan with the help of the officials at the Taliban Center in Quetta, Pakistan, he went to the Khoja Khar line. (J. Ex. 40 ¶ 14.) Nevertheless, petitioner contends that he did not go to the Khoja Khar line as a fighter and that he did not receive weapons training at the Khoja Khar line. In light of petitioner's own admissions, the Court disagrees.

14

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

Petitioner argues that he went from Konduz to the Khoja Khar line because he "became curious about the fighting occurring" there. (*Id.*) It is inconceivable that the Taliban would allow an outsider to stay at their front line camp just to see what the fighting was like. An outsider, whose trustworthiness and loyalty are unknown, poses a threat to a military camp. Moreover, petitioner's explanation is inconsistent with his previous admission that he went to the Khoja Khar line to fight. (*See, e.g.*, J. Exs. 1, 18.)

Petitioner also contends that he did not receive weapons training at the Khoja Khar line. (J. Ex. 40 ¶ 15.) The reliable evidence in the record refutes this contention. Petitioner admitted on numerous occasions that he trained for *at least* one week on an AK-47. (J. Exs. 1, 7, 18; Gov't Ex. 1.) In addition, petitioner's statement that a soldier lent him an AK-47 for a few practice shots is not only unreliable but also highly unlikely. (J. Ex. 40 ¶ 15.) Certainly, a soldier would not lend a stranger his AK-47 without first knowing whether or not the stranger was an ally.

At the Merits Hearing, petitioner offered two additional reasons for why he cannot be lawfully detained as a part of the Taliban: he was at the Khoja Kjar line before the United States invaded Afghanistan; and he did not engage in combat. The Court agrees that petitioner was likely not at the Khoja Khar line when the United States invaded Afghanistan on October 7, 2001, and that petitioner likely did not engage in combat in Afghanistan. (*See* J. Ex. 18; Gov't Ex. 1.) The Court, however, finds that those facts do not preclude a finding that petitioner more likely than not was part of the Taliban. To be sure, those facts are relevant to the Court's inquiry, but there is no doubt that an individual may be part of the Taliban without being at the front line.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

*See Hamlily*, 616 F. Supp. 2d at 75 (finding that an individual need only function within the command structure of the Taliban to be lawfully detained).

Accordingly, the Court concludes that respondents have demonstrated by reliable evidence that petitioner more likely than not went to the Khoja Khar line to join the Taliban's fight against the Northern Alliance and that petitioner more likely than not received weapons training when he was stationed at the Khoja Khar front line.

### 3.   *Petitioner Volunteered to Serve as a Medic on an "As Needed" Basis*

It is undisputed that petitioner worked at clinics run by Dr. Aziz in Dastereshi and Konduz.  The issue is whether petitioner worked at the clinics on an as needed basis within the command structure of the Taliban, or whether he worked at the clinics on his own volition, free from the Taliban's command.  Based on the reliable evidence, the Court finds that petitioner more likely than not worked at the clinics on an as needed basis within the command structure of the Taliban.

Petitioner argues that upon arriving in Afghanistan, he went to work for a clinic run by Dr. Aziz in Konduz.  (J. Ex. 40 ¶ 13.)  Then after visiting the front line, petitioner worked at another clinic run by Dr. Aziz in Dastareshi before returning to the clinic in Konduz.  (*Id.* ¶¶ 16-17.)  While working with Dr. Aziz, petitioner contends that he only treated four persons for battle wounds.  (*Id.* ¶ 18.)

Petitioner's argument is contrary to his prior reliable admissions.  First, petitioner's admissions state that he was stationed on the front line at Khoja Khar before serving in a clinic.  (*See* J. Exs. 1, 5, 7, 18; Gov't Ex. 1.)  Second, petitioner volunteered to serve as a medic when a

16

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

superior asked for volunteers to be trained as medics. (Gov't Ex. 1.)  By volunteering to serve as

a medic, petitioner did not remove himself from the command structure of the Taliban.  Rather,

like a soldier volunteering for a special duty, petitioner remained in the command structure of the

Taliban and served as a medic only on an as needed basis.  In addition, he was transferred from

the clinic in Dastereshi to the clinic in Konduz as the Northern Alliance advanced toward the

Khoja Khar line.  (*Id.*)  The fact that petitioner was transferred from one clinic to another tends to

demonstrate that petitioner functioned within the command structure of the Taliban.  Last,

petitioner treated numerous battle injuries.  For example, at the Dastereshi clinic, petitioner

treated six to seven wounded soldiers a day for twenty-five days.  (*Id.*)

Accordingly, based on the reliable evidence in the record, the Court concludes that

petitioner more likely than not served as a medic on an as needed basis within the command

structure of the Taliban.

### 4.      *Petitioner Traveled to Mazar-e-Sharif on His Commander's Orders to Surrender*

Petitioner contends that he was not ordered to go to Mazar-e-Sharif as part of Thakker's

surrender and safe-passage agreement.  Petitioner fails, however, to offer an alternative reason

for why he was at Mazar-e-Sharif with Thakker's troops when they surrendered.  He simply

states, without further explanation, that he and Dr. Aziz went to Mazar-e-Sharif.  (J. Ex. 40 ¶ 20.)

Based on the reliable evidence in the record, the Court rejects petitioner's contention.

At the Merits Hearing, petitioner's counsel urged the Court to infer from his lack of

explanation that petitioner was fleeing the fighting in Konduz or that Thakker's surrender applied

**17**

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

to all foreigners, not just fighters. Those inferences, however, are not supported by the reliable

evidence. The reliable evidence shows that on November 23, 2001, the Taliban fell to the

Northern Alliance, and the Taliban commander, Thakker, surrendered. (J. Ex. 18 ¶ 12.) The

surrender included a safe passage for Thakker's men from Konduz to Kandahar by way of

Mazar-e-Sharif. (J. Ex. 1 ¶ 11.) According to the terms of the safe passage, the men would

surrender at Kandahar and be returned to their home countries. (J. Ex. 5.) As a result, Thakker's

troops then left for Konduz via Mazar-e-Sharif. (J. Ex. 1 ¶ 11.) When his men were outside

Mazar-e-Sharif, the Northern Alliance detained Thakker's men, forced them to surrender their

weapons, and transported them to the Qala-i-Jangi prison. (J. Ex. 1 ¶ 12.)

The reliable evidence further shows that petitioner was with Thakker's men when they

were detained by Dostum. (J. Exs. 1 ¶¶ 11-12, 18 ¶¶ 12-13; Gov't Ex. 1.) He was then forced to

surrender his weapon and transported to the Qala-i-Jangi prison with Thakker's troops. (J. Exs. 1

¶ 12, 18 ¶ 13; Gov't Ex. 1.) As a result, the most logical inference for the Court to make is that

petitioner was traveling to Mazar-e-Sharif to eventually surrender at Kandahar on Thakker's

orders.

Petitioner correctly asserts that the reliable evidence does not explicitly state that

petitioner was ordered to surrender or that petitioner surrendered on his commander's orders.

Such a definitive statement, however, is not necessary. Respondents need not show that

petitioner was ordered to surrender beyond a reasonable doubt; rather they need only show that

petitioner was ordered to surrender by a preponderance of the evidence. As stated above, the

reliable evidence shows that petitioner went to Mazar-e-Sharif with Thakker's troops to

**18**

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

surrender and be returned to Yemen. Accordingly, respondents have met their burden. The reliable evidence demonstrates that petitioner more likely than not went to surrender at Mazar-e-Sharif on his commander's orders.

## C.   Petitioner May Not Invoke the First Geneva Convention As a Source of Private Rights in a Habeas Corpus Proceeding

Petitioner argues in the alternative that even if he were a part of the Taliban, he is not detainable because he qualifies as non-detainable medical personnel under the First Geneva Convention. *See* Article 24, Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forced in the Field (hereinafter "First Geneva Convention") (providing that medical personnel "exclusively engaged in . . . treatment of the wounded or sick, or in the prevention of disease" are not detainable, except as necessary to treat other prisoners).

Petitioner's argument fails. "No person may invoke the Geneva Conventions . . . in any habeas corpus proceeding . . . as a source of rights in any court of the United States." *See* 28 U.S.C. § 2241 (Note).[3] Thus, the Court may only look to "the text of the relevant statutes and controlling domestic caselaw" to determine whether petitioner's detention is lawful. *Al-Bihani*, 590 F.3d at 871-72. Those sources provide that an individual may be lawfully detained if he

---

[3] This provision was enacted as Section 5 of the Military Commissions Act, Pub. L. No. 109-366, § 5, 120 Stat. 2600, 2631 (Oct. 17, 2006). In *Boumediene v. Bush*, the Supreme Court declared Section 7 of the Military Commissions Act, 28 U.S.C. § 2241(e), unconstitutional because it "effects an unconstitutional suspension of the writ [of habeas corpus.]" 553 U.S. 723, 128 S. Ct. 2229, 2274 (2008). The Court left the remaining provisions of the act intact. *Id.* at 2275-76. Thus, Section 5 of the Military Commissions Act remains constitutional and does not effect a suspension of the writ of habeas corpus.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

were part of, or substantially supported, the Taliban, al Qaeda, or associated forces. *See id.* at 871-874 (analyzing the relevant statutory text and caselaw to determine the President's detention authority).

As discussed in detail above, the Court has determined that the reliable evidence in the record demonstrates that petitioner more likely than not was part of the Taliban. This determination ends the Court's inquiry into whether petitioner's detention is lawful. Accordingly, petitioner's detention is lawful.

\*         \*         \*

In sum, the reliable evidence in the record shows that petitioner more likely than not was part of the Taliban. Petitioner more likely than not went to Afghanistan to fight with the Taliban; received weapons training while stationed at the Khoja Khar line; volunteered to serve as a medic when the need arose; and surrendered on his commander's orders. Accordingly, petitioner's detention is lawful.

Although the reliable evidence in the record demonstrates that petitioner more likely than not was part of the Taliban, the undersigned, like Judge Hogan in *Anam*, "is not convinced that it is more likely than not that [p]etitioner is a threat to the security of the United States." 2010 WL 58965, at \*13. Petitioner was a low-level member or associate of the Taliban. He spent no more than a few weeks at the front line, and there is no evidence that he "planned in, participated in, or knew of any terrorist plots." *Id.* The Court hopes that this Memorandum does not foreclose the government from continuing to review petitioner's file and assess whether he continues to pose a threat to the national security of the United States.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## IV.    CONCLUSION

For the reasons set forth above, the Court concludes that respondents have demonstrated by a preponderance of evidence that petitioner was more likely than not part of the Taliban. Accordingly, petitioner is being lawfully detained by respondents, and his petition for habeas corpus shall be denied.

A separate Order shall issue this date.

3/24/10

DATE

ROYCE C. LAMBERTH
CHIEF JUDGE

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE