UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MUKHTAR YAHIA NAJI
AL WARAFI (ISN 117),

Petitioner,

v.

BARACK OBAMA, *et al.*,

Respondents.

Filed with Classified
Information Security Officer
CISO _____
Date _____9/1/11_____

Civil Action No. 09-2368 (RCL)

## MEMORANDUM OPINION

This case is before the Court on remand from the United States Court of Appeals for the District of Columbia Circuit. The Court is to consider only one issue here—whether petitioner was permanently and exclusively engaged as a medic within the meaning of Article 24 of the First Geneva Convention and § 3-15(b)(1)–(2) of Army Regulation 190-8. Upon consideration of the parties' briefs on remand, the replies thereto, the applicable law, and the entire record herein, the Court will GRANT respondents' Renewed Motion on Remand for Judgment on the Record and DENY petitioner's petition for a writ of habeas corpus.

### I. PROCEDURAL BACKGROUND

On March 24, 2010, this Court denied petitioner Mukhtar Al Warafi's habeas petition. Based on its review of the evidence as a whole, the Court concluded that petitioner was more likely than not part of the Taliban at the time of his capture. *See* Unclassified Mem. Op. 12–19 [16]. In reaching this conclusion, the Court found that petitioner "more likely than not served as a medic on an as needed basis within the

command structure of the Taliban." *Id.* at 16. Petitioner argued in the alternative that even if he was part of the Taliban, he is not detainable because he was permanently and exclusively engaged as a medic under Article 24 of the First Geneva Convention. The Court rejected that argument under § 5 of the Military Commissions Act, which provides that "[n]o person may invoke the Geneva Conventions . . . as a source of rights" in a habeas proceeding. *Id.* at 19 (citing Pub. L. No. 109-366, § 5, 120 Stat. 2600, 2631 (codified at 28 U.S.C. § 2241 Note)). The Court thus held that its determination that petitioner was more likely than not part of the Taliban ended its inquiry into whether petitioner's detention is lawful.

On February 22, 2011, the Court of Appeals affirmed this Court's holding that petitioner was more likely than not part of the Taliban at the time of his capture. Judgment 1 [39]. The Court of Appeals noted, however, that the Court "did not explicitly address whether Al Warafi was permanently and exclusively medical personnel within the meaning of Article 24 of the First Geneva Convention and Army Regulation 190-8, § 3-15(b)(1)–(2), assuming arguendo their applicability." *Id.* The Court of Appeals was uncertain whether the Court's conclusion that petitioner more likely than not served as a medic on an as needed basis "was tantamount to finding that Al Warafi served only as *auxiliary* medical personnel within the meaning of Article 25 of the Convention," or whether that conclusion related only to the Court's determination that Al Warafi was part of the Taliban. *Id.* at 2. The Court of Appeals thus remanded the case to this Court to "consider (or reconsider) Al Warafi's argument that he was permanently and exclusively engaged as a medic and to make a finding on this issue." *Id.* On August 26, 2011, having received the parties' briefs and reply briefs, this Court held a merits hearing on the issue.

## II. RELEVANT FACTUAL BACKGROUND

### A. *Evidence Previously Submitted to the Court*

The Court need not provide a complete factual background here, as such information can be found in its Memorandum Opinion denying petitioner's habeas petition. *See* Unclassified Mem. Op. 2–6 [16]. For the narrow purposes of this opinion, it suffices to restate the relevant factual findings that the Court made in determining that petitioner was more likely than not part of the Taliban. The Court of Appeals has affirmed these findings, and thus they are the law of the case.

After weighing the evidence in the record—namely, reliable statements that petitioner himself made to his interrogators—the Court found that petitioner more likely than not traveled to Afghanistan for the purpose of fighting with the Taliban against the Northern Alliance. *Id.* at 3, 13–14. The Court further found that petitioner went to the Khoja Khar line—the front line where the Taliban was fighting the Northern Alliance—with the help of officials at a Taliban center in Quetta, Pakistan. *Id.* at 14–15. On the basis of the record, the Court concluded that petitioner more likely than not went to the front line to fight against the Northern Alliance and that he more likely than not received weapons training there. *Id.* The Court also found, however, that "petitioner likely did not engage in combat in Afghanistan." *Id.* at 15; *see also id.* at 4 (stating that petitioner received weapons training but did not engage in any active combat).

The Court then found that petitioner, after spending one to two weeks on the front line, volunteered for medic training when a superior asked for volunteers. *Id.* at 4, 16–17. The Court found, and respondents did not dispute, that petitioner worked in two clinics run by Dr. Abdullah Aziz, a Saudi doctor. *Id.* at 16. Petitioner was first transferred to a

clinic in Dastareshi, located approximately twenty miles from the Khoja Khar line, for first aid training. *Id.* at 4, 16–17. Dr. Aziz taught petitioner how to clean wounds, draw blood, and recognize the symptoms of malaria. *Id.* at 4. Petitioner remained there for approximately twenty-five days and treated six to seven sick or wounded Taliban fighters per day. *Id.* When the Northern Alliance advanced toward the Khoja Khar line, he was transferred to Dr. Aziz's clinic in Konduz. *Id.* at 4, 17. After one month of treating Taliban fighters there, petitioner left to work at a hospital because the area in which the clinic was located had become too dangerous as the Northern Alliance advanced toward Konduz. *Id.* at 4–5.

In making the above findings, the Court considered petitioner's argument that he immediately went to work for Dr. Aziz in Konduz upon arriving in Afghanistan. Petitioner claimed that he then worked at the Dastereshi clinic before returning to the Konduz clinic. *Id.* at 16. The Court rejected these assertions, finding them contrary to petitioner's prior reliable statement that he had been stationed on the Khoja Khar line *before* serving in a clinic. *Id.*

In November 2001, the Taliban agreed to surrender to coalition forces. *Id.* at 5, 18. As part of the surrender, petitioner's Taliban commander, Thakker, negotiated a safe passage from Konduz to Kandahar via Mazar-e-Sharif for the troops under his command. *Id.* at 5, 18. The Court found that both petitioner and Dr. Aziz were with Thakker's troops when they were captured by the Northern Alliance outside of Mazar-e-Sharif. *Id.* at 5, 18. Petitioner was captured with a weapon, which he was forced to surrender, and transported to Qala-i-Jangi prison with Thakker's troops. *Id.* at 18. On the basis of the record, the

Court concluded that petitioner more likely than not went to surrender at Mazar-e-Sharif on Thakker's orders. *Id.* at 19.

### *B. Additional Evidence on Remand*

Pursuant to the Court's scheduling order on remand, the parties have submitted additional evidence on the issue of whether petitioner served as permanent and exclusive medical personnel within the meaning of Article 24 of the First Geneva Convention. Petitioner has produced a declaration—his second declaration in this case—in which he states: "Starting before American bombing in Afghanistan and continuing until I was captured and taken to Mazer-e-Sharif, I was a full-time medical worker under the supervision of a Saudi doctor, Dr. Abdul Aziz." Pet.'s Br. on Remand Ex. R ("Second Decl."). Petitioner claims that he "performed no military duties and had no military responsibilities" during this period. *Id.* He states that he "worked with Dr. Aziz from early morning to the afternoon every day," except that he "stopped at noon on Thursdays and did not work on Fridays." *Id.* Petitioner further states that he lived with Dr. Aziz while working under his supervision in Konduz in a house that was "next to the clinic . . . so it was convenient to go to and from work." *Id.*[1]

The government has produced, among other documents, the declaration of [redacted] [redacted] *See* Resp'ts Renewed Mot., Additional Ex. 1 [redacted]

---

[1] Petitioner notes that Dr. Aziz, "[t]he person in the best position to describe his medical work," was killed by the Northern Alliance in November 2001 after petitioner and Dr. Aziz surrendered. Pet. Br. on Remand 6; *see also* Unclassified Mem. Op. 5 [16].

SECRET//NOFORN 5

██████ *Id.* ¶ 1. He states that ██████

██████

██████ *Id.* ¶¶ 3, 11. ██████

██████

██████ *Id.* ¶ 4. ██████

██████

██████ *Id.* ¶¶ 6–7. ██████

██████ *Id.* ¶ 8.

██████

██████ *Id.* ¶ 9. ██████

██████

██████ *Id.*[3] ██████ states that ██████

██████

██████ *Id.* ¶ 10. Similarly, ██████

██████

██████ *Id.*

### III.  LEGAL FRAMEWORK

The President has authority under the Authorization for Use of Military Force (AUMF), Pub. L. 107-40, § 2(a), 115. Stat. 224 (2002), to detain individuals who were part of or substantially supported al-Qaeda, the Taliban, or associated forces engaged in

hostilities against the United States or its coalition partners. *Al-Bihani v. Obama*, 590 F.3d 866, 873–74 (D.C. Cir. 2010). As the government conceded on appeal, its detention authority under the AUMF is informed by the laws of war. *See* Resp'ts Renewed Mot. 12 n.7, 23. For the purposes of this proceeding, the relevant provisions of the First Geneva Convention and Army Regulation 190-8, both of which bar the detention of certain medical workers, are outlined below.

### A. *The First Geneva Convention*

The First Geneva Convention governs, among other things, the treatment and protection of military medical personnel. *See* Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (Aug. 12, 1949), 6 U.S.T. 3114 ("First Geneva Convention"). It protects two distinct categories of military medical personnel, defined respectively in Articles 24 and 25. Article 24 personnel are "[m]edical personnel *exclusively engaged* in the search for, or the collection, transport or treatment of the wounded or sick, or in the prevention of disease, [and] staff *exclusively engaged* in the administration of medical units and establishments." *Id.* art. 24 (emphasis added). The Convention provides that such personnel "shall be respected and protected in all circumstances." *Id.* Under Article 28, "[p]ersonnel designated in Article[] 24 . . . shall be retained only in so far as the state of health . . . and the number of prisoners of war require." *Id.* art. 28. If Article 24 personnel are not needed to take care of prisoners of war, they "shall be returned to the Party to the conflict to whom they belong, as soon as a road is open for their return and military requirements permit." *Id.* art. 30.

It is precisely because Article 24 personnel are assigned exclusively to medical duties that they are afforded "special immunity, even on the battlefield." First Geneva

Convention Commentary ("GC Commentary") 219 (Int'l Comm. of Red Cross). Although "[i]t is for each power to decide the composition of its Medical Services and to say who shall be employed in it," only those who are exclusively engaged in the provision of medical services are "assured of protection." *Id.* at 218. "The words 'exclusively engaged' indicate that the assignment must be permanent," which—as discussed below—"is not the case in Article 25 dealing with auxiliary personnel." *Id.* at 219. Indeed, "to enjoy immunity, [Article 24 personnel] must naturally abstain from any form of participation—even indirect—in hostile acts." *Id.* at 221. The protection to which they are entitled "ceases if they are used to commit acts 'harmful to the enemy.'" *Id.*

The Commentary to the Convention provides that Article 24 personnel "are to be furnished with the means of proving their identity provided for in Article 40." GC Commentary 218. Article 40, in turn, sets forth the manner in which a military authority must identify Article 24 personnel. Specifically, such personnel "*shall wear*, affixed to the left arm, a water-resistant armlet bearing the distinctive emblem, issued and stamped by the military authority." First Geneva Convention, art. 40 (emphasis added). Such personnel "*shall also carry* a special identity card bearing the distinctive emblem." *Id.* (emphasis added). These materials are intended to distinguish Article 24 personnel, providing them with security during hostilities and enabling them to prove their protected status if captured. *See* GC Commentary 312–15.

The Convention and its Commentary describe a number of criteria regarding the armlet and identity card that a military authority must provide to Article 24 personnel. As to the armlet, "[w]hat is above all essential is to ensure the 'bonafides' of the wearer." *Id.* at 310. Accordingly, the "armlet will have no protective value, and cannot be lawfully

worn, unless it has been stamped and issued by the military authority. This time the condition is an essential one, admitting of no exception." *Id.* at 311. The official stamp "show[s] that the armlet has been issued by, and on the responsibility of, the military authority," and is thus intended to "prevent abuses" by those not entitled to Article 24 status. *Id.* The Commentary further provides, however, that the "armlet is not in itself sufficient to establish the status of the wearer. If he falls into enemy hands, *he must be able to prove that he is entitled to wear it.*" *Id.* at 312 (emphasis added). Accordingly, a "*special identity card is . . . necessary*" to put a detained individual "in a position to *prove* that he is a member of the medical or religious personnel, in order that he may enjoy the status accorded to him under the Convention." *Id.* (emphasis added). Article 40 describes the required features of this card—namely, that the card "shall state in what capacity [the individual] is entitled to the protection of the present Convention." First Geneva Convention, art. 40. Additionally, the card "shall be embossed with the stamp of the military authority." *Id.* This "condition imposed by the Convention is the most important [because] . . . [i]t is this stamp which makes the card, like the armlet, authentic." GC Commentary 315.

Article 25 personnel[2]—or "auxiliary medical personnel"—are those "[m]embers of the armed forces *specially trained for employment, should the need arise,* as hospital orderlies, nurses or auxiliary stretcher-bearers, in the search for or the collection, transport or treatment of the wounded and sick." First Geneva Convention, art. 25 (emphasis added). In contrast to Article 24 personnel, who are "permanent staff . . . employed exclusively on medical duties," Article 25 personnel are "only employed for

---

[2] The question of whether petitioner qualifies as Article 25 personnel is not before the Court, as he has never claimed such status.

part of their time on such duties." GC Commentary 221. Such personnel "are, *when necessary—that is to say, occasionally—*used by their officers" to care for the wounded. *Id.* (emphasis added). They are otherwise available to be "assigned to other military duties" for the remainder of their time. *Id.* Article 25 personnel are thus considered "semi-combatant [and] semi-medical." *Id.* at 223. While Article 24 personnel receive protection under the Convention at all times, Article 25 personnel receive protection only if "they are carrying out [medical] duties at the time when they come into contact with the enemy or fall into his hands." First Geneva Convention, art. 25.

### *B. Army Regulation 190-8, § 3-15*

United States Army Regulation 190-8, § 3-15 describes those enemy personnel who are eligible to be certified as "retained personnel"—that is, personnel who "will be retained only insofar as the state of health . . . and the number of [enemy prisoners of war] require. Persons whose retention is not required will be repatriated as soon as military requirements permit." Army Regulation 190-8, §§ 3-15(b), (w). Two categories of medical personnel are eligible to be certified as retained personnel:

> (1) Medical personnel who are members of the medical services of their armed forces.
> (2) Medical personnel who are *exclusively engaged* in:
>   (a) The search for or the collection, transport, or treatment of the wounded or sick.
>   (b) The prevention of disease.
>   (c) Staffs *exclusively engaged* in administering medical units and establishments.

*Id.* § 3-15(b)(1)–(2) (emphasis added). Individuals who are entitled to retained status "*should have on their person at the time of capture a special identity card attesting to their status* . . . [that] state[s] in what capacity the bearer is entitled to the protection" of

SECRET//NOFORN

10

UNCLASSIFIED//FOR PUBLIC RELEASE

the Geneva Conventions. *Id.* § 3-15(a) (emphasis added). This requirement applies to *both* categories of medical personnel described above. *See id.* § 3-15(a)–(b).

As the government notes, Army Regulation 190-8 merely constitutes the Executive Branch's implementation the 1949 Geneva Conventions. *See id.* § 1-1(b). It provides the "policy, procedures, and responsibilities" for the treatment of enemy personnel in the custody of the U.S. Armed Forces, *id.* § 1-1(a), and expressly states that "[i]n the event of conflicts or discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence." *Id.* § 1-1(b)(4).

## IV.  DISCUSSION

As noted above, this Court previously held that § 5 of the Military Commissions Act bars petitioner from invoking the Geneva Conventions as an independent source of rights in his habeas proceeding. But per the Court of Appeals' instruction, the Court is to assume for purposes of this remand proceeding that Article 24 of the First Geneva Convention and Army Regulation 190-8 apply. Respondents, while taking no position on the extent to which the Geneva Conventions inform the AUMF, *see* Resp'ts Renewed Mot. 24, 29, argue that petitioner has not shown that he was permanently and exclusively engaged as a medic within the meaning of Article 24.[3] Petitioner argues to the contrary, and thus contends that Article 24 and Army Regulation 190-8, § 3-15(b)(1)–(2) render his detention unlawful. Petitioner relies on (1) this Court's factual findings in denying his habeas petition; (2) additional evidence—disclosed by respondents after the Court of Appeals rendered its decision—which petitioner argues demonstrates that he was

---

[3] Respondents' arguments focus primarily on Article 24 of the First Geneva Convention. As respondents explain, the Geneva Conventions take precedence over Army Regulation 190-8 in the event of conflict between the two documents. *See* Army Regulation 190-8, § 1-1(b)(4). For this same reason, the Court will focus its analysis on Article 24.

engaged as a full-time medic once he began working with Dr. Aziz; and (3) the declaration he has submitted on remand.

### A. *Petitioner Bears the Burden of Proving His Status as Permanent Medical Personnel Entitled to Protection under Article 24 or Army Regulation 190-8*

In its mandate to this Court, the Court of Appeals suggested in dictum that petitioner bears the burden of proving that he is entitled to protection under Article 24 or Army Regulation 190-8: "Because he did not carry an identification card or wear an armlet bearing the emblem of the Medical Services at the time of his capture, it appears that Al Warafi bears the burden of proving his status as permanent medical personnel." Judgment 2 [39]. Petitioner disagrees, arguing that neither the First Geneva Convention nor Army Regulation 190-8 address the burden of proof in judicial proceedings. Petitioner points to the Case Management Order that governs Guantanamo habeas proceedings, which provides that "[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." Case Management Order § II.A, Misc. No. 08-442 (TFH), Nov. 6, 2008 [940]. He argues that his detention is unlawful if he qualifies as non-detainable medical personnel under Article 24 or Army Regulation 190-8. Thus, petitioner argues, it is respondents' burden to prove that he falls outside the protection of those provisions.

The Court rejects petitioner's contention. There is no question that it was respondents' burden to prove that petitioner's detention is lawful—that is, "that petitioner more likely than not was part of the Taliban" at the time of his capture. Unclassified Mem. Op. 8 [16]; *see also Al-Bihani*, 590 F.3d at 872 (explaining that the government may lawfully detain an individual who was part of or supported the Taliban). But this Court has already held that petitioner was more likely than not part of the Taliban, and

the Court of Appeals has affirmed that holding. Petitioner now claims Article 24 status not to contest that holding—indeed, he cannot do so under the law of this case—but to demonstrate that he is *exempt* from detention *notwithstanding* that he was part of the Taliban. As the Supreme Court has explained in the context of Guantanamo habeas proceedings:

> [O]nce the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria. A burden-shifting scheme of this sort would meet the goal of ensuring that the errant tourist, embedded journalist, or local aid worker has a chance to prove military error while giving due regard to the Executive once it has put forth meaningful support for its conclusions that the detainee is in fact an enemy combatant.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004) (plurality opinion). Because respondents have already met their burden of proving that petitioner was part of the Taliban at the time of his capture, the burden has shifted to petitioner to prove that he is nevertheless exempt from detention under Article 24 or Army Regulation 190-8.[4]

### B. Petitioner Fails to Prove His Status as Permanent Medical Personnel Entitled to Protection under Article 24 or Army Regulation 190-8

The Court finds that petitioner has failed to prove his status as permanent medical personnel within the meaning of Article 24 of the First Geneva Convention or Army Regulation 190-8. As described above, Article 24 personnel "are to be furnished with the means of proving their identity." GC Commentary 218. To that end, Article 40 mandates that Article 24 personnel "*shall wear* . . . an armlet bearing the distinctive emblem" and "*shall also carry* a special identity card bearing the distinctive emblem." First Geneva Convention, art. 40. The Convention regards proper identification as a "valuable" means

---

[4] The question of who has the burden of proof here is academic. Even if the burden were on respondents, the evidence in the record and the applicable law would compel the same outcome in this case.

of "prevent[ing] abuses" by persons ineligible for Article 24 status who might otherwise impersonate medical personnel to exploit the Convention's protections. GC Commentary 311; *see id.* (stating that there is "no exception" to the requirement that the military authority stamp and issue the armlets required by Article 40); *id.* at 315 (setting forth the "most important" condition that identity cards contain the stamp of the official authority). Proper identification is thus required not only to protect medical personnel on the battlefield, but to establish their status if captured. *Id.* at 310. Notably, the Commentary provides that an armlet alone is insufficient to prove the wearer's status; rather, an identity card is "necessary" to put a detained individual "in a position to prove that he is a member of the medical . . . personnel, in order that he may enjoy the status accorded to him under the Convention." *Id.* at 312; *see also* First Geneva Convention, art. 40 ("The card. . . . shall state in what capacity [the detained individual] is entitled to the protection of the present Convention.").

Simply put, the First Geneva Convention creates a straightforward regime in which proper identification is *necessary* to prove one's protected status as permanent medical personnel. The Court finds no language in either the Convention or its Commentary admitting any exception to this requirement.[5] Nowhere does the Convention suggest *other* means by which a detained individual can prove his protected status. Instead, the Convention contemplates that identification is necessary and thus focuses entirely on the means of ensuring that such identification is authentic. The Convention's identification requirements are neither surprising nor onerous. Given that Article 24

---

[5] Petitioner argues that the Court of Appeals, in remanding his case to this Court while noting that he "did not carry an identification card or wear an armlet bearing the emblem of the Medical Services at the time of capture," Judgment 2 [39], necessarily found that the lack of such identification does not preclude Article 24 status. But the Court of Appeals made this observation in dicta, and there is nothing in its Judgment to indicate that it considered either the requirements of the First Geneva Convention or the merits of petitioner's claim that he qualifies as Article 24 personnel.

SECRET//NOFORN 14

affords *total* immunity to permanent medical personnel, *see* GC Commentary 219, it is no wonder that the Convention imposes strict conditions designed to prevent manipulation or subterfuge by ineligible individuals attempting to benefit from an improper assertion of protected status.

At the time of his surrender, petitioner carried no form of identification indicating his status as permanent medical personnel. Nor has he presented any other documentation that might put him "in a position to prove that he is a member of the medical . . . personnel, in order that he may enjoy the status accorded to him under the Convention." *Id.* at 313.[6] This comes as no surprise, as the evidence shows that the ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ within the meaning of Article 24. *See* ▌▌▌ Decl. ¶¶ 3, 11. Petitioner thus lacks what the Convention regards as the preeminent credential by which a detained individual can validate his protected status under Article 24.[7]

Petitioner argues that Article 24 requires only that medical personnel be "exclusively engaged" in medical work. He contends that nothing in the text requires that medical personnel also receive "bureaucratic designation" for their medical work. Pet.'s

---

[6] Notably, the Commentary recognizes that alternative documentation—which petitioner does not claim to have carried—is likely insufficient to prove one's status under Article 24. Prior to 1949, medical personnel did not carry official identification and thus attempted to prove their status "either from an entry in their pay-book, or by a special document." GC Commentary 313. These attempts often failed—"[m]edical personnel who were taken prisoner were often unable to have their status and their right to repatriation recognized." *Id.* To "eliminate these serious drawbacks," the current system requires a "special identity card" that is "uniform throughout the same armed forces." *Id.*; *see also* First Geneva Convention, art. 40.

[7] As indicated above, *supra* note 3, the Court is focusing its analysis only on Article 24. But the Court's conclusion is nevertheless consistent with Army Regulation 190-8, which provides that individuals entitled to retained status—*e.g.*, permanent medical personnel—"should have on their person at the time of capture a special identity card attesting to their status . . . [that] state[s] in what capacity the bearer is entitled to the protection" of the Geneva Conventions. Army Regulation 190-8, § 3-15(a).

Br. on Remand 9. Thus, petitioner argues, the Court should focus only on a functional assessment of whether he was exclusively engaged as a medic. The Court disagrees. Article 24's text is descriptive—it *describes* those individuals who are eligible for protected status. It cannot be read without reference to Article 40, which sets forth the means by which an individual *proves* that he is eligible for protected status. As the Commentary to the Protocol Additional to the Geneva Conventions explains:

> The principal persons protected by the Conventions and the Protocols, *i.e.*, the wounded, sick and shipwrecked, can be identified by means of their condition . . . [but] [t]he same does not apply to the personnel and objects protected in their functional capacity . . . . A soldier with medical duties is actually an able-bodied person who might well engage in combat . . . . *Thus it is essential for medical personnel . . . to be identified in order to ensure the protection to which they are entitled.*

Commentary to the Protocol Additional to the Geneva Conventions 222 (Int'l Comm. of Red Cross) (emphasis added). A functional assessment is therefore insufficient to establish whether petitioner is entitled to protection under Article 24.

The inadequacy of a functional assessment is underscored by the fact that the Convention guarantees full immunity *only* to persons engaged as permanent medical personnel. Consider the following scenario. A soldier comes upon a uniformed individual who is attending to the wounded on the battlefield. Reliance on a functional evaluation would leave the soldier without the means of determining whether the uniformed individual is a permanent medic entitled to full immunity or an enemy combatant who is simply attending to the wounded *at that time*.[8] Proper identification is thus necessary to

---

[8] The necessity of proper identification to distinguish Article 24 personnel is reinforced by the absence of any identification requirements for Article 25 personnel—who receive protection only "if they are carrying out [medical] duties at the time when they come into contact with the enemy or fall into his hands." First Geneva Convention, art. 25.

SECRET//NOFORN 16

enable battlefield participants to readily identify those persons who qualify for protection under Article 24.

Given the regime contemplated by the Convention, petitioner's effort to prove his status through other means must fail. He emphasizes this Court's previous finding that petitioner, after leaving the front line, served as a Taliban medic in two clinics and a hospital in Afghanistan. *See* Unclassified Mem. Op. 4–5, 16–17 [16]. He further highlights the Court's finding that he "likely did not engage in combat in Afghanistan." *Id.* at 15. Petitioner argues that these findings, coupled with additional evidence—including his own declaration stating that he was a full-time medic—establish that he was permanently and exclusively engaged in medical work. Under the terms of the Convention, petitioner's evidence is insufficient. Nothing in today's opinion ignores or contradicts the Court's previous findings as to petitioner's work as a medic. But neither those findings nor petitioner's additional evidence can replace the proof required by the Convention—that is, official identification demonstrating that he is entitled to protected status under Article 24. Absent such identification, petitioner simply cannot prove that he qualifies as Article 24 personnel.

Were the Court to hold otherwise, it would afford the Convention's protections beyond their intended scope. And in doing so, it would endorse an unworkable standard—one that allows a detained individual to establish Article 24 status through means other than those set forth in the Convention. The Court need not expound on the evidentiary difficulties this would entail; they are easy to imagine. The Convention is designed to avoid such uncertainty, and this Court is not in a position to circumvent its express conditions.

The Court understands the implication of its decision here—that where a warring party provides no identification to its medical personnel, such personnel cannot establish protected status under Article 24. But this result, while unfortunate, is not absurd. The Convention requires proper identification precisely because Article 24 affords *total immunity* to qualifying personnel. Nothing prevents parties like the Taliban from providing medical personnel with the identification materials mandated by Article 40. But until they do so, their medical personnel will lack the means by which they can prove their entitlement to Article 24's protections.

## V. **CONCLUSION**

For the reasons set forth above, respondents' Renewed Motion on Remand for Judgment on the Record will be granted and petitioner's petition for a writ of habeas corpus will be denied. A separate Order consistent with this Memorandum Opinion shall issue this date.

8/31/11
DATE

ROYCE C. LAMBERTH
CHIEF JUDGE