UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MUKHTAR YAHIA NAJI AL WARAFI, ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> BARACK H. OBAMA, *et al.*, ) <br> Respondents. ) <br> ) | Civil Action No. 09-2368 (RCL) |

## MEMORANDUM OPINION

Petitioner Mukhtar Yahia Naji al Warafi ("petitioner") once again challenges the legality of his detention at the United States Naval Base in Gauntanamo Bay, Cuba ("Guantanamo"). In petitioner's previous challenge, this Court held his detention lawful under the Authorization for the Use of Military Force ("AUMF"), Pub. L. No. 107–40 § 2(a), 115 Stat. 224 (2002), because respondents had shown that petitioner more likely than not belonged to the Taliban when captured. *Al Warafi v. Obama*, 704 F. Supp. 2d 32, 35 (D.D.C. 2010). Petitioner now argues that recent statements by the President conclusively prove that the hostilities that justified his detention, those between the United States and the Taliban, have ended. Respondents counter that the AUMF continues to authorize petitioner's detention because the United States remains engaged in active hostilities with the Taliban in Afghanistan.

Before the Court is Plaintiff's Motion to Grant Petition for Writ of Habeas Corpus [80]. Upon consideration of Plaintiff's Motion and Memorandum in Support thereof and supplements thereto, Respondents' Opposition and supplements thereto, the arguments made in open court on July 14, 2015, the entire record in this case, and the applicable law, the Court will DENY Plaintiff's Motion [80].

**I.    BACKGROUND**

1

In November 2001, the Northern Alliance captured petitioner in Afghanistan. The United States took custody of petitioner from the Northern Alliance and has detained him at Guantanamo since 2002. Petitioner filed for a writ of habeas corpus challenging that detention in 2004. In 2010, this Court denied that petition on the aforementioned basis. *Al Warafi v. Obama*, 704 F. Supp. 2d at 35. The D.C. Circuit affirmed the Court's finding that respondents had shown that petitioner "was more likely than not part of the Taliban," but remanded to determine whether he qualified as protected medical personnel under the First Geneva Convention and Army Regulation 190-8. *Al Warafi v. Obama*, 409 Fed. App'x 361, 362 (D.C. Cir. 2011). On remand, this Court ruled that petitioner had failed to prove that he so qualified. *Al Warafi v. Obama*, 821 F. Supp. 2d 47, 54–56 (D.D.C. 2011). The D.C. Circuit affirmed that ruling, 716 F.3d 627 (2013), and denied Al Warafi's petition for rehearing en banc, *Al Warafi v. Obama*, No. 11-5276 (D.C. Cir. 2013). The Supreme Court denied Al Warafi's petition for a writ of certiorari. *Al Warafi v. Obama*, 134 S. Ct. 2134 (2014).

On December 15, 2014, the President gave a speech in which he said that "[t]his month, after more than 13 years, our combat mission in Afghanistan will be over," and that "[t]his month America's war in Afghanistan will come to a responsible end." Pet'r's Mot. Ex. A, at 2. In his State of the Union Address on January 20, 2015, the President stated that "our combat mission in Afghanistan is over." Pet'r's Mot. Ex. B, at 1. On January 28, 2015, the President again said that "our combat mission in Afghanistan is over and America's longest war has come to a responsible and honorable end." Pet'r's Mot. Ex. J, at 1. On May 23, 2015, the President stated that the upcoming Memorial Day would be the first "since our war ended in Afghanistan," and that "[i]n Afghanistan, our troops now have a new mission—training and advising Afghan forces." Pet'r's Mot. Ex. K, at 1. On May 25, 2015, the President delivered a speech at the Arlington National

Cemetery in which he described that day as the first Memorial Day "since our war in Afghanistan came to an end." Pet'r's Mot. Ex. L, at 1. He also said that the "fewer than 10,000 troops" remaining in Afghanistan are pursuing "a mission to train and assist Afghan forces." *Id.* at 2. After stating that "Afghanistan remains a very dangerous place," the President described a recent American casualty as "the first American servicemember to give his life to this new mission to train Afghan forces." *Id.* at 2–3.

## II. LEGAL STANDARDS

### A. AUMF Detention

The AUMF provides

> [t]hat the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

When it expires or how it may be revoked is left unsaid. In *Hamdi v. Rumsfeld*, a plurality of the Supreme Court, based on "longstanding law-of-war principles," took Congress's "grant of authority for the use of 'necessary and appropriate force'" in the AUMF to "include the authority to detain for the duration of the relevant conflict." *Hamdi*, 542 U.S. 507, 521 (2004) (plurality opinion); *see also Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014) ("[T]his court has repeatedly held that under the [AUMF], individuals may be detained at Guantanamo so long as they are determined to have been part of Al Qaeda, the Taliban, or associated forces, and so long as hostilities are ongoing."). Congress later endorsed this understanding of respondents' detention power in the 2012 National Defense Authorization Act ("NDAA"), which authorized "[d]etention under the law of war without trial until the end of hostilities authorized by the [AUMF]." NDAA § 1021(c)(1).

3

### B. Who Determines the End of Hostilities for the Purposes of AUMF Detention

Respondents maintain that determining when hostilities have ended is reserved for the political branches, and petitioner agrees that "a conflict is over when the President says it is over." Resp't's Opp'n 27; Pet'r's Mot. 6. So the question of who decides when hostilities have ended for the purposes of AUMF detention is not one the litigants dispute in this case—they merely differ on what, exactly, the President has decided.

At the hearing on petitioner's motion, respondents conceded that whether there are active hostilities sufficient to justify AUMF detention is not a political question, but suggested that the Court could not contradict the President's litigation position on that issue. The Court is inclined to disagree: The notion that courts can hear habeas petitions only insofar as they rule for the government on a potentially dispositive issue is, if anything, even more insidious than the notion that courts cannot decide the issue at all. But because the Court concludes that active hostilities continue—and would so conclude whether it conducted an independent examination or deferred to Respondents completely—the Court need not decide the appropriate standard of review. This case presents issues that may be relevant for years or decades to come, however. Consequently, the Court will still explain why it would, if necessary, reject both parties' arguments that the President's statements control regardless of the facts on the ground.

#### i. *The Court's Role in a Habeas Proceeding*

Courts are traditionally "reluctant to intrude upon the authority of the executive in military and national security affairs" unless Congress specifically provides otherwise. *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) (collecting cases). In *Ludecke v. Watkins*, the Supreme Court said that the termination of a state of war "is a political act," and that for such "matters of political judgment . . . judges have neither the technical competence nor official responsibility." 335 U.S.

160, 169–70. The D.C. Circuit has held that the "determination of when hostilities have ceased is a political decision, and we defer to the Executive's opinion on the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war." *Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010) (*see also al Maqaleh v. Hagel*, 738 F.3d 312, 330 (D.C. Cir. 2013) ("Whether an armed conflict has ended is a question left exclusively to the political branches."), *cert. dismissed sub nom. al-Maqaleh v. Hagel*, 135 S. Ct. 782 (2014)).

On the other hand, the *Hamdi* plurality recognized that such deference must have limits, and noted that

> as critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat.

542 U.S. 507, 530 (citing *Ex parte Milligan*, 4 Wall. 2, 125 (1866)). Perhaps with that risk in mind, *Hamdi* held that the AUMF's detention authorization turns partly on whether "*the record establishes* that United States troops are still involved in active combat in Afghanistan." 542 U.S. at 521 (emphasis added). A "record" implies a court, and though *Hamdi* does not explicitly say that the record in such cases must be reviewed (and the determination made) by a court rather than the Executive, no other reading makes sense: "[T]he one constant in the history of habeas [has been] *the independent power of a judge to assess the actions of the Executive.*" *Al-Bihani v. Obama*, 590 F.3d 866, 880 (D.C. Cir. 2010) (emphasis added). By requiring that there be a record to review, and a court to review it, *Hamdi* "appears to limit the President's authority to detain" despite *Ludecke*'s admonition against second-guessing the judgment of the political branches regarding the state of war. *See* 542 U.S. at 588 (Thomas, J., dissenting). Though *Hamdi* may appear to contradict *Ludecke*, it does no more than address a question that *Ludecke* expressly

reserved: "Whether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled." *Ludecke*, 335 U.S. at 169. The *Hamdi* plurality, at last compelled to answer this grave question, held that a court can and must examine such issues, including the issue of whether active hostilities continue, itself.

While *Hamdi* is a plurality opinion, in *Boumediene v. Bush* a majority of the Supreme Court took a closely analogous position that, read in conjunction with *Hamdi*, appears to control this case. 553 U.S. 723 (2008). *Boumediene* conceded that "in other contexts the Court has held that questions of sovereignty are for the political branches to decide," but nevertheless rejected the government's argument that de jure sovereignty over Guantanamo was a missing prerequisite for habeas corpus jurisdiction. *Id.* at 753, 755. In that Court's words,

> [a]bstaining from questions involving formal sovereignty and territorial governance is one thing. To hold the political branches have the power to switch the Constitution on or off at will is quite another. The former position reflects this Court's recognition that certain matters requiring political judgments are best left to the political branches. The latter would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say "what the law is."

*Id.* at 765 (citations omitted). *Boumediene*, like *Hamdi*, reasoned that habeas rights that lived and died by the unexamined word of the political branches would be fatally flawed. *Compare id.* at 765–66 ("The test for determining the scope of [habeas] must not be subject to manipulation by those whose power it is designed to restrain."), *with Hamdi*, 542 U.S. at 537 ("Any process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short.").

The Executive branch has elsewhere recognized that the existence of armed conflict cannot be taken for granted in detainee cases. In *United States v. Al Bahlul*, the United States Court of Military Commission Review ("USCMCR") observed that "[t]he 2007 [Manual for Military Commissions] . . . require[es] proof beyond a reasonable doubt that the offense occurred in the context of an armed conflict." 820 F. Supp. 2d 1141, 1189 (USCMCR 2011), *vacated on other grounds*, No. 11-1324, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013). And while neither the military commissions nor the USCMCR are Article III courts, their decisions are reviewable by the D.C. Circuit and the Supreme Court. *See* 10 U.S.C. § 950g.

This is not to say that the due process protections provided by military commissions are a constitutional floor for habeas proceedings; the example merely proves that what respondents portray as iron law is in fact a principle that sometimes yields to other constitutional values, practical concerns notwithstanding. *Compare The Protector*, 79 U.S. 700, 702 (1871) ("Acts of hostility by the insurgents occurred at periods so various, and of such different degrees of importance, and in parts of the country so remote from each other . . . that it would be difficult, if not impossible, to say on what precise day it began or terminated."), *with Al-Bahlul*, 820 F. Supp. 2d at 1190 (quoting from a list of factors to consider in determining "whether an armed conflict existed between the United States and al Qaeda and when it began").

Respondents' other cited authorities are, like *Ludecke*, either distinguishable (none of them deal with habeas) or apparently overruled to the extent they conflict with *Hamdi* and *Boumediene*. *United States v. Anderson* addressed a statute governing the reclamation of abandoned property in the aftermath of the Civil War; in doing so, the Court deferred to political proclamations concerning the end of hostilities on the ground that Congress had likely not intended to burden Union soldiers with the task of determining that date. 76 U.S. 56, 70–71 (1869). *The Protector*

dealt with the question of when statutes of limitations were tolled by the Civil War; it also accepted political branch proclamations as conclusive only "[i]n the absence of more certain criteria, of equally generally application." 79 U.S. at 702. In *The Three Friends*, the Court found that a statute mandating the forfeiture vessels used to aid belligerents applied to a ship whose owners had intended to offer as aid to Cuban revolutionaries, even where the political branches had not formally recognized Cuba's insurgency as "belligerents," but had merely recognized the reality of political revolt. 166 U.S. 1, 62–64 (1897). *Commercial Trust Co. of New Jersey v. Miller* concerned the operation of a wartime statute governing the seizure of assets held on behalf of an "alien enemy." 262 U.S. 51, 54–55 (1923). *Citizens Protective League v. Clark*, like *Ludecke*, dealt with the removal rather than the detention of enemy aliens. 155 F.2d 290, 294 (1946). And while *Baker v. Carr* did say with respect to "[d]ates of duration of hostilities" that "it has been stated broadly that 'the power which declared the necessity is the power to declare its cessation, and what the cessation requires,'" the Court also stated that there are "isolable reasons for the presence of political questions," and that such "deference rests on reason, not habit." 369 U.S. 186, 213 (1962). When such reasons are absent—e.g. when "[t]he question in a particular case may not seriously implicate considerations of finality," or when "clearly definable criteria for decision may be available"—a reviewing court "is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared." *Id.* at 213–14 (quoting *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924)).

The Court finds no support in any of the aforementioned cases to reject the principle, cited in *Baker* itself and embodied in *Hamdi* and *Boumediene*, that "even the war power does not remove constitutional limitations safeguarding essential liberties." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934).

8

### ii. *The President's Speeches are not Dispositive as to the Existence of Active Hostilities*

Having rejected the proposition that it is the President and not this Court who must decide whether active hostilities exist, the next hurdle is determining what evidence the Court may consider in making that finding. The second question is not entirely distinct from the first—after all, if the Court had to decide the issue but could consider only what the President has said, there would be little to do—but still merits its own discussion.

Petitioner's argument assumes that the President's stance on the existence of hostilities is conclusive in this case, and that one discerns that stance from speeches, and speeches alone. Taking these premises together, Petitioner essentially argues that the President has a peculiar strain of King Midas's curse: Everything he says turns to law. By this blinkered logic, so long as he maintained that active hostilities were ongoing in Afghanistan, the President could preserve his AUMF detention power even if he withdrew all U.S. military presence from Afghanistan, stopped any military aid to the Afghan government, and brokered a lasting peace treaty between the U.S., the Taliban, al Qaeda, and the Afghan government. But war is not a game of "Simon Says," and the President's position, while relevant, is not the only evidence that matters to this issue. *See Al-Bihani*, 590 F.3d at 874 ("The Conventions, in short, codify what common sense tells us must be true: release is only required when the fighting stops."); *see also Al-Bahlul*, 820 F. Supp. 2d at 1190 (listing factors to consider in "determining whether an arm conflict existed"). Petitioner even halfway concedes this, asserting that while "a conflict is over when the President says it is over," "[a] different question would be presented if a habeas petitioner claimed that the relevant conflict had ended but the President disagreed. In such a case, petitioner submits that the President's position would not be conclusive or unreviewable in a habeas action." Pet'r's Mot. 6 n.4.

Petitioner does not explain the discrepancy; more importantly, the case he poses as hypothetical is real. It is this case.

In support of this conclusion, respondents have submitted, among other things, a signed letter from the President, dated June 11, 2015, in which he says that "there are approximately 9,100 U.S. forces in Afghanistan" for the "purposes of training, advising, and assisting Afghan forces, conducting and supporting counterterrorism operations against the remnants of al-Qa'ida, and taking appropriate measures against Taliban members who directly threaten U.S. and coalition forces in Afghanistan or provide direct support to al-Qa'ida." Resp't's Notice of Suppl. Authority Ex. 1, at 3. The President's letter goes on to say that "[t]he United States currently remains in an armed conflict against al-Qa'ida, the Taliban, and associated forces, and active hostilities against those groups remain ongoing." *Id.* Respondents have also submitted a Department of Defense Report which likewise states that "[a]s a matter of international law, the United States remains in an armed conflict against al Qaeda, the Taliban and associated forces." Resp't's Notice of Suppl. Authority Ex. 2, at 12.

Petitioner counters that these statements were included with an eye to this case, and should be rejected as *post hoc* justifications invented to prevail here. Petitioner is right that a court should be wary of deception. *See, e.g., United States v. Virginia*, 518 U.S. 515, 533 (1996) (state justification for gender classification "must be genuine, not hypothesized or invented *post hoc* in response to litigation"). But the Court's job is harder than accepting all earlier-in-time statements as true and all later-in-time statements as false. Even if we assume the speeches petitioner cites mean what he claims they mean—and one could parse their language so that they do not, as respondents point out—the President's earlier statements that the war is over could, hypothetically, be false, and his later statements that active hostilities continue could, hypothetically, be true.

10

Petitioner fails to recognize that this is possible, let alone provide reasons to believe that it is not so.

Additionally, the Supreme Court has held that even where Congress explicitly tied the expiration of congressionally-authorized war powers to Presidential proclamation, those powers are not undone by "passing references in messages to Congress, nor by newspaper interviews with high officers of the army or with officials of the War Department." *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 167 (1919). In *Hamilton*, a whiskey company argued that a World War I statute governing the sale of spirits—one that by its own terms was to last "until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States," 40 Stat. 1045, 1046, c. 212—had been rendered inoperative by President Wilson's public statements "that the war has ended and peace has come, that certain war agencies and activities should be discontinued, that our enemies are impotent to renew hostilities and that the objects of the act here in question have been satisfied in the demobilization of the army and navy." *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. at 159.

The *Hamilton* Court, in determining whether the state of war that had initially justified the statute had ended, discounted President Wilson's statements on the ground that the political branches' actual conduct showed that war persisted. *See id.* at 164 (stating that because "the treaty of peace had not yet been concluded, . . . the railways are still under national control by virtue of the war powers, . . . other war activities have not been brought to a close, and . . . it cannot even be said that the man power of the nation has been restored to a peace footing, we are unable to conclude that the act has ceased to be valid"). Given that Congress declined to explicitly make the war power at issue here expire by Presidential proclamation, *Hamilton*'s logic applies even more

forcefully. Based on the evidence presented in this case, the Court sees every reason to believe that President Obama's words, like President Wilson's, "were doubtless used in a popular sense." *Id.* at 167.

Petitioner's obsession with Presidential speeches recalls the tale of the man who lost his keys: A police officer sees a man looking for something under a streetlamp and asks the man what it is he's looking for. The man responds that he's looking for his keys, so the officer decides to help. After several minutes the officer asks the man if he's quite sure this is where he lost his keys. The man says no; he lost them over in the park. The officer, befuddled, asks why they've been looking under the streetlamp, to which the man replies "the light's better over here." A court cannot look to political speeches alone to determine factual and legal realities merely because doing so would be easier than looking at all the relevant evidence. The government may not always say what it means or mean what it says: The Affordable Care Act's individual mandate, for example—described in the statute and in public statements as a penalty, not a tax increase—was defended before and upheld by the Supreme Court as a tax. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2600 (2012). The Court's responsibility here is likewise to determine the objective existence or nonexistence of active hostilities using all relevant evidence.

### C. Standard of Review

Petitioners propose no standard of review at all, and argue instead that the President's statement that the United States' combat mission in Afghanistan has ended "is a conclusive, unreviewable determination of the end of combat for purposes of detaining prisoners captured in the war in Afghanistan against the Taliban." Pet'r's Mot. 6. Respondents likewise argue that the Court cannot second-guess the President, though they interpret the President's statement differently. Both positions are wrong, and the Court must conduct its own examination of the

issue. Under *Al-Bihani*, a preponderance of the evidence standard is not unconstitutional in detainee habeas cases. 590 F.3d at 878. This Court therefore will continue to follow the procedures set out in the Case Management Order ("CMO") issued by Judge Hogan in the consolidated habeas cases on November 6, 2008, as amended December 16, 2008. Pursuant to the Amended CMO, respondents "bear the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." *In re Guantanamo Bay Litig.*, 08–442, CMO § II.A. (Nov. 6, 2008). As explained above, because this Court finds herein that respondents have prevailed on this issue by a preponderance of the evidence, it need not decide whether respondents were obliged to meet that standard.

### III. ANALYSIS

#### A. Petitioner Need not file a New Habeas Petition to Request This Relief

Respondents object to the form of petitioner's filing on the ground that it asserts a new legal theory never raised in his earlier petition, and does so without either filing a new petition or moving for relief from the prior judgment under Fed. R. Civ. P. 60(b). But as petitioner points out, respondents fail to identify any element missing from petitioner's motion that would be required in either a Rule 60(b) motion or a new petition. The Court therefore will deem petitioner's present motion to be a Rule 60(b) motion for relief from this court's previous judgment with respect to his earlier habeas petition.

#### B. Active Hostilities Persist

As the *Al-Bihani* court said, "release is only required when the fighting stops." 590 F.3d at 874. Respondents have offered convincing evidence that U.S. involvement in the fighting in Afghanistan, against al Qaeda and Taliban forces alike, has not stopped. *See, e.g.*, Resp't's Opp'n 10–17; *see also* Resp't's Opp'n Ex. 10. Petitioner has two responses.

First, petitioner argues that any engagements between U.S. forces and the Taliban "would at most be collateral effects of pursuing al Qaeda or assisting the Afghan security forces, and do not represent a war by the United States against the Taliban." Pet'r's Suppl. Reply 3. But war is not required here; all the AUMF detention authority demands is that the fighting continue. The government has shown that the fighting in fact continues, and petitioner does not dispute this. Petitioner asserts that one rationale for wartime detention (the fear of replenishing the enemy's ranks) would not be implicated by his release because (1) petitioner is not an Afghan and has no current connection with the Taliban or Afghanistan, and (2) respondents could simply not release him to Afghanistan. Pet'r's Reply 6. As to the first point, that did not stop petitioner from assisting the Taliban in the first place, and the Court sees no reason to think it would stop him now; as to the second, petitioner does not say how respondents could, having released him to somewhere besides Afghanistan, stop him from returning there.

Second, petitioner reiterates that the President's speeches are not "repealed or nullified" by the combat operations actually being carried out by Taliban or U.S. forces. Pet'r's Suppl. Reply 3. But, as explained earlier, it is only law that need be repealed or nullified, and the President's speeches were not law.

**CONCLUSION**

For the foregoing reasons, the Court DENIES petitioner's Motion to grant his petition for a writ of habeas corpus. A separate ORDER consistent with this Memorandum Opinion shall issue this date, July 30, 2015.

ROYCE C. LAMBERTH
United States District Judge